**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOLOMON FELDMAN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>APOLLO GLOBAL MANAGEMENT, INC., MARC ROWAN, and LEON BLACK,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Solomon Feldman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Apollo Global management, Inc. ("Apollo" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Apollo Global securities between May 10, 2021 and February 21, 2026, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Apollo Global securities during the Class Period and was economically damaged thereby.

7. Defendant Apollo Global describes itself as a "high-growth, global alternative asset manager and a retirement services provider."

8. Apollo Global is incorporated in Delaware and its head office is located at 9 West 57th Street, 42nd Floor, New York, NY, 10019. Apollo Global's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "APO".

9. Defendant Marc Rowan ("Rowan") has served as the Company's Executive Officer ("CEO") at all relevant times.

10. Defendant Leon Black ("Black") was a co-founder of Apollo Global and its former CEO and chairman before stepping down prior to the start of the Class Period. However, he remained a control person, holding 7.0% of Apollo Global's common stock as of April 25, 2025.

11. Defendants Rowan and Black are collectively referred to herein as the "Individual Defendants."

12. Each of the Individual Defendants:

    (a) directly participated in the management of the Company;

    (b) was directly involved in the day-to-day operations of the Company at the highest levels;

    (c) was privy to confidential proprietary information concerning the Company and its business and operations;

    (d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

13. Apollo Global is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15. Apollo Global and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

16. This complaint relates to Jeffrey Epstein ("Epstein"). Epstein was an American financier and a sex offender. He worked at Bear Sterns before opening a consulting firm called Intercontinental Assets Group Inc. ("IAG") in 1981. IAG focused on helping wealthy clients recover embezzled funds. Epstein then worked at Towers Financial Corporation, which was eventually exposed as a Ponzi scheme. He then founded J. Epstein & Company (which became Financial Trust Company), which managed assets for ultra-high net worth individuals.

17. Through these roles, Epstein accrued significant wealth and became an acquaintance of wealthy and powerful figures, including Defendant Black.

18. Epstein was also a sexual predator. He was the subject of multiple criminal prosecutions and civil lawsuits relating to his misconduct and extensive criminal activity. On July 8, 2019, prosecutors in the Southern District of New York charged Epstein with sex trafficking

and conspiracy to commit sex trafficking of minors. On August 10, 2019, Epstein was found dead in his cell at the Metropolitan Correctional Center in New York City of an apparent suicide.

19. On October 12, 2020, The New York Times published an article titled, "The Billionaire Who Stood by Jeffrey Epstein." The article detailed the relationship between Defendant Black and Jeffrey Epstein, including that Defendant Black had "wired Mr. Epstein at least $50 million in the years after Mr. Epstein's 2008 conviction for soliciting prostitution from a teenage girl" and that "[i]t was not clear what kind of services Mr. Epstein provided to Mr. Black[.]" The article also reported that a spokesperson for Defendant Black stated that "Mr. Epstein did not do any work for Apollo[.]"

20. On October 20, 2020, The Wall Street Journal published an article titled, "Apollo Board Panel to Review Leon Black's Ties With Jeffrey Epstein." The article reported that a group of independent board members of Apollo Global would review Defendant Black's relationship with Jeffrey Epstein (the "Investigation"). Apollo Global hired Dechert LLP to conduct the Investigation.

21. On October 30, 2020, Apollo Global held an earnings call for the fiscal quarter ended September 30, 2020. During this earnings call, Apollo Global's Head of Investor Relations Gary M. Stein stated, "Apollo ***never did any business*** with Jeffrey Epstein." (Emphasis added.)

22. During the same call, Defendant Black mirrored the sentiment, stating, "First and most important, ***Apollo never did any business with Epstein***. Neither Epstein nor any company controlled by him ever invested in any funds managed by Apollo." (Emphasis added.)

23. On January 25, 2021, Apollo Global issued a public statement announcing the results of the Investigation (the "Dechert Report"). According to the Dechert Report, "Apollo never retained Epstein for any services and Epstein never invested in any Apollo-managed funds"

5

and stated that the "findings of the report are consistent with statements made by Mr. Black and Apollo regarding the prior relationship."

### Materially False and Misleading Statements Issued During the Class Period

24. The class period starts on May 11, 2021, when Apollo Global filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 Report"). Attached to the 1Q21 Report was a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Rowan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

25. The 1Q21 Report reiterated the prior statements by Defendant Black and Apollo Global that Jeffrey Epstein had never done any work for Apollo Global. The 1Q21 Report also incorporated by reference the Dechert Report. The 1Q21 Report stated the following:

> On January 25, 2021, the Company announced that the conflicts committee of the board of directors has completed its previously announced independent review of Mr. Black's previous professional relationship with Jeffrey Epstein and publicly released the review's findings. ***The findings of the report are consistent with statements made by Mr. Black and Apollo regarding the prior relationship***.

(Emphasis added).

26. This statement was materially false and misleading because Epstein was heavily involved and frequently communicated with Apollo Global's senior leadership in the 2010s, including the Individual Defendants, concerning Apollo Global's business.

27. On August 6, 2021, Apollo Global filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report was a certification pursuant to SOX signed by Defendant Rowan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial

6

reporting and the disclosure of all fraud.

28. The 2Q21 Report contained statements reiterating prior statements by Apollo Global and Mr. Black that the Company had no dealings with Jeffrey Esptein. The 2Q21 Report also incorporated the Dechert Report by reference. The 2Q21 Report stated, in relevant part:

> On January 25, 2021, the Company announced that the conflicts committee of the board of directors had completed its previously announced independent review of Mr. Black's previous professional relationship with Jeffrey Epstein and publicly released the review's findings. ***The findings of the report are consistent with statements made by Mr. Black and Apollo regarding the prior relationship***.

(Emphasis added).

29. This statement was materially false and misleading because Epstein was heavily involved and frequently communicated with Apollo Global's senior leadership in the 2010s, including the Individual Defendants, concerning Apollo Global's business.

30. On November 8, 2021, Apollo Global filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Report"). Attached to the 3Q21 Report was a certification pursuant to SOX signed by Defendant Rowan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

31. The 3Q21 Report repeated prior statements that Apollo Global had no business dealings with Jeffrey Epstein. The 3Q21 Report also incorporated the Dechert Report by reference. The 3Q21 Report stated, in pertinent part:

> On January 25, 2021, the Company announced that the conflicts committee of the board of directors had completed its previously announced independent review of Mr. Black's previous professional relationship with Jeffrey Epstein and publicly released the review's findings. ***The findings of the report are consistent with statements made by Mr. Black and Apollo regarding the prior relationship.***

(Emphasis added).

32. This statement was materially false and misleading because Epstein was heavily involved and frequently communicated with Apollo Global's senior leadership in the 2010s, including the Individual Defendants, concerning Apollo Global's business.

33. On February 25, 2022, Apollo Global filed with the SEC its Annual report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report was a certification pursuant to SOX signed by Defendant Rowan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

34. The 2021 Annual Report contained the following statement concerning Apollo Global's involvement with Jeffrey Epstein:

> On January 25, 2021, the Company announced that (i) the conflicts committee of the board of directors had completed its previously announced independent review of Mr. Black's previous professional relationship with Jeffrey Epstein and publicly released the review's findings

35. This statement was materially false and misleading because, by incorporating the Dechert Report by reference, the Company reiterated prior statements that Apollo Global had never done business with Jeffrey Epstein. In truth, Jeffrey Epstein was heavily involved and frequently communicated with Apollo Global's senior leadership in the 2010s, including the Individual Defendants, concerning Apollo Global's business.

36. The 2021 Annual Report also contained the following risk disclosure on employee misconduct:

> ***Misconduct by our current and former employees, directors, advisers, third party-service providers or others affiliated with us could harm us by impairing our ability to attract and retain investors and by subjecting us to significant legal liability, regulatory scrutiny and reputational harm.***
>
> ***<u>Our reputation is critical to maintaining and developing relationships</u>*** with the investors in our funds, potential fund investors and third parties with whom we do

business, and *<u>there is a risk that our employees, directors, advisers, third party-service providers or others affiliated with us could engage, deliberately or recklessly, in misconduct</u>* or fraud that creates legal exposure for us and adversely affects our businesses. In recent years, there have been a number of highly publicized cases involving fraud, conflicts of interest or other misconduct by individuals in the financial services industry (including in the workplace via inappropriate or unlawful behavior or actions directed to other employees). [. . .] *<u>Additionally, our current and former employees, directors, consultants, sub-contractors or other affiliates and those of our funds' portfolio companies becoming subject to allegations of</u>* sexual harassment, racial and gender discrimination or other similar *<u>misconduct, could, regardless of the ultimate outcome, result in adverse publicity that could significantly harm our and such portfolio company's brand and reputation</u>*. Similarly, allegations of misconduct could affect our reputation and ability to raise funds even if the allegations pertain to activities not related to our business and/or are proven to be unsubstantiated. *<u>Furthermore, our business often requires that we deal with confidential matters of great significance to us, our funds and companies in which our funds may invest, as well as trade secrets. If our employees, directors, consultants, sub-contractors or other affiliates were improperly to use or disclose confidential information, we could suffer serious harm to our reputation, financial position and current and future business relationships, as well as face potentially significant litigation or investigation</u>*. It is not always possible to deter misconduct or fraud by employees or service providers, and the precautions we take to detect and prevent this activity may not be effective in all cases. Misconduct or fraud by our current and former employees, directors, advisers, third-party service providers, other affiliates or those of our funds' portfolio companies, or even unsubstantiated allegations, could result in a material adverse effect on our reputation and our businesses.

(Underlined emphasis added)

37. This disclosure was materially false and misleading because, by the time it was issued, Apollo Global knew or should have known, based on its possession and review of certain of Individual Defendants' and other partners' email correspondence with Epstein, that the Company had business dealings with Jeffrey Epstein. Indeed, Individual Defendants knew that they had discussed business matters concerning Apollo Global with Jeffrey Epstein, and, for Defendant Rowan, as the CEO of Apollo Global, his knowledge can be imputed onto the Company.

38. The statements contained in ¶¶ 25-36 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the

9

Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants Rowan and Black, among other leadership figures at Apollo Global, frequently communicated with Jeffrey Epstein in the 2010s regarding Apollo Global's business; (2) as a result, Apollo Global's assertion that the Company had never done business with Jeffrey Epstein was untrue; (3) because of the entanglement between Apollo Global's leaders and Jeffrey Epstein, the harm to Apollo Global's reputation was more than a mere possibility; and (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times.

## THE TRUTH BEGINS TO SLOWLY MATERIALIZE AND EMERGE THROUGH PARTIAL DISCLOSURES

39. On February 1, 2026, The Financial Times published an article titled, "Apollo chief Marc Rowan consulted Epstein on firm's tax affairs." The article stated that files released by the U.S. Department of Justice showed that "Epstein requested and received internal Apollo financial documents and emailed, met and called some of the firm's most senior decision makers on sensitive matters."

40. Concerning Defendant Rowan, the article reported the following:

Files released last week reveal that Rowan, Black's successor, was also in contact with Epstein during the mid-2010s. Epstein pleaded guilty to soliciting prostitution from a minor in 2008.

***Rowan repeatedly corresponded with Epstein***, who ingratiated himself among senior figures in finance by positioning himself as an expert on tax planning, ***over the value of Apollo's so-called "tax receivable agreement"***.

The TRA was a stream of payments owed to Apollo's founders and pre-IPO shareholders, marked at hundreds of millions of dollars on the US firm's balance sheet.

***In March 2016, Rowan forwarded a detailed internal TRA calculation to Epstein***, who complained that he could not download an attached image. Rowan responded: "I am getting the calculation detail."

* * *

***Epstein's contact with Rowan appears to have extended to various issues.*** In one email he describes a meeting that appears to have been with the Apollo chief: ***"Mark [sic] was here this morning; we talked Athene, Montauk, Rothschild. Planes boats etc."***

41.     The article also detailed Epstein's involvement in Apollo Global's tax "inversion" deal. In connection to this, Epstein was in contact with Defendant Rowan and Sanjay Patel, another Apollo Global partner who "[ran] Apollo's business in Europe." The article stated:

> Epstein was also involved in discussions in 2016 about a possible tax "inversion" deal that would have involved redomiciling Apollo overseas to reduce its tax bill.
>
> ***Emails show that the disgraced financier touted the expertise of Swiss private bank Edmond de Rothschild and hosted a meeting between senior executives of the two firms at his Manhattan townhouse.***
>
> "using rothschild for the inversion allows interesting structures," Epstein wrote. Rowan quickly responded: "Agreed. Cynthia has been slow to call my partner, Gernot Lohr, back."
>
> The email appears to refer to Cynthia Tobiano, an executive at Edmond de Rothschild, while Lohr is an Apollo partner. ***Epstein forwarded Rowan's email to Ariane de Rothschild, the bank's chief executive***, who replied that she was "surprised" a call had not been made.

* * *

> In 2015, another Apollo partner, ***Sanjay Patel, emailed Epstein. "I run Apollo's business in Europe. Marc Rowan asked me to catch up with you regarding the Rothschild conversations."*** Patel and Epstein then arranged a phone call together.
>
> That year, Epstein wrote to Ariane de Rothschild, "the apollo people are ready to start doing things together with you , sanjay patel. is their man in europe. based in london."

(Emphasis added).

11

42. The article provided further details on the various ways Jeffrey Epstein was involved in Apollo Global's business. The article reported:

> According to the newly released files, **Rowan and Imran Siddiqui, a former senior partner at Apollo, met with executives from Edmond de Rothschild at Epstein's Manhattan townhouse in early 2016**.
>
> **Apollo's former chief legal officer, John Suydam, also called or met Epstein on multiple occasions, according to emails disclosed in the files**.
>
> In 2014, Black's family office **forwarded to Epstein an internal share offering document for Athene Holding, its life insurance affiliate**, an email shows.
>
> **As Apollo prepared to take Athene public the following year, Epstein appeared to propose a plan that he claimed could save Apollo's co-founders up to $300mn in tax, for which he would charge a 25 per cent success fee**.
>
> \*   \*   \*
>
> The documents also show that **Epstein was involved in discussions at Apollo about an apparent issue with US tax forms relating to foreign partnerships**, along with Brad Karp, chair of law firm Paul Weiss, which has long represented Apollo and Black personally.
>
> In September 2016 **the head of Black's family office, Brad Wechsler, emailed Apollo's then head of tax finance, Suzanne Wong, asking for Karp and Epstein to be copied in on emails and included on "upcoming calls"**.
>
> "For Brad its to keep him abreast of activity; for jeffrey its also get the benefit of his substantive expertise," Weschler added. Wong replied: "Will do."

43. On this news, the price of Apollo Global stock fell $1.35 per share to close at $133.19 on February 2, 2026. Apollo Global share prices continued to drop and, on February 3, 2026, Apollo Global share prices dropped an additional $6.34 to close at $126.85.

44. On February 17, 2026, The Financial Times published an article titled, "SEC urged to investigate Apollo over Epstein ties". The article reported that the American Federation of Teachers and the American Association of University Professors "told the SEC's enforcement director Margaret Ryan in a letter on Tuesday that they believed Apollo's communications to

investors "give an inaccurate and incomplete picture of the firm and its partners' connections to Epstein"."

45. On this news, Apollo Global share prices dropped from closing on February 17, 2026 at $125.15 to $118.34, a drop of $6.81 over two trading days.

46. On February 21, 2026, CNN published an article titled, "How Wall Street's Apollo got tangled up again in the Epstein files". The article repeated information previously revealed by the Financial Times articles, but contained new information that reported on Apollo Global's response to the letter sent by the teacher's union. The article quoted Eleanor Bloxham, founder and CEO of The Value Alliance Company, which advises boards and executives, who said the unions have a "strong case" for pushing for an SEC investigation, described Apollo's response as "very weak", and questioned why Defendant Rowan's meetings and correspondence with Jeffrey Epstein was not previously disclosed.

47. On this news, Apollo Global shares dropped by $5.99, or approximately 5%, to close at $113.73 on February 23, 2026.

48. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Apollo Global securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and

their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

51. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

55. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

56. Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

57. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

58. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

16

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

62. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

63. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class,

or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

64. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

65. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

66. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

67. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

68. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

70. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

71. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

72. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 2, 2026              THE ROSEN LAW FIRM, P.A.

/s/ Phillip Kim
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*