UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SOLOMON FELDMAN, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. 1:26-cv-01692-ALC |
|  | : |  |
|  | : | <u>CLASS ACTION</u> |
| Plaintiff, | : |  |
|  | : |  |
|  | : | MEMORANDUM OF LAW IN SUPPORT |
| vs. | : | OF MOTION FOR APPOINTMENT AS |
|  | : | LEAD PLAINTIFF AND APPROVAL OF |
| APOLLO GLOBAL MANAGEMENT, INC., | : | LEAD PLAINTIFF'S SELECTION OF |
| MARC ROWAN, and LEON BLACK | : | LEAD COUNSEL |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

4913-3013-4694.v1

## I.    INTRODUCTION

Pending before the Court is a securities class action lawsuit on behalf of purchasers or acquirers of Apollo Global Management, Inc. ("Apollo" or the "Company") publicly traded securities between May 10, 2021 and February 21, 2026, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") against the Company and certain of its executive officers.  The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires courts to "appoint the most adequate plaintiff as lead plaintiff." *See* 15 U.S.C. §78u-4(a)(3)(B)(ii).  The most adequate plaintiff is the "member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members."  15 U.S.C. §78u-4(a)(3)(B)(i).

Here, United Teamster Pension Fund-A and Insulators and Allied Workers National Pension Fund (the "Institutional Investors") should be appointed lead plaintiff because they filed a timely motion, have a significant financial interest in the outcome of this litigation, and will typically and adequately represent the class's interests.  *See* 15 U.S.C. §78u-4(a)(3)(B)(iii).  In addition, the Institutional Investors' selection of Robbins Geller Rudman & Dowd LLP to serve as lead counsel is reasonable and should be approved.  *See* 15 U.S.C. §78u-4(a)(3)(B)(v).

## II.    FACTUAL BACKGROUND

Apollo is a private equity firm specializing in investments in credit, private equity, infrastructure, secondaries, and real estate markets.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "APO."  Defendant Leon Black ("Black") is a co-founder of Apollo, as well as its former CEO and chairman.  Black and Apollo have been under scrutiny for their ties to Jeffrey Epstein ("Epstein") since October 2020.

4913-3013-4694.v1

On October 12, 2020, *The New York Times* published an article titled, "The Billionaire Who Stood by Jeffrey Epstein," detailing the relationship between Black and Epstein. The article explained that Black had "wired Mr. Epstein at least $50 million in the years after Mr. Epstein's 2008 conviction for soliciting prostitution from a teenage girl" and that "[i]t was not clear what kind of services Mr. Epstein provided to Mr. Black." ECF 1 at ¶19. Black and the Company subsequently issued statements insisting that ***Apollo never did any business with Epstein***. *Id*. at ¶¶21-22. Apollo hired Dechert LLP to conduct an investigation into Black's relationship with Epstein and ultimately announced that "Apollo never retained Epstein for any services and Epstein never invested in any Apollo-managed funds." *Id*. at ¶23. The Company added that the findings of the investigation were "consistent with statements made by Mr. Black and Apollo regarding the prior relationship." *Id*.

The complaint alleges that defendants throughout the Class Period made false and/or misleading statements and/or failed to disclose that: (i) defendants CEO Marc Rowan ("Rowan") and former CEO Black, among other leadership figures at Apollo, frequently communicated with Epstein in the 2010s regarding Apollo's business; (ii) as a result, Apollo's assertion that it had never done business with Epstein was untrue; and (iii) because of the entanglement between Apollo's leaders and Epstein, the harm to Apollo's reputation was more than a mere possibility.

On February 1, 2026, *The Financial Times* published an article titled, "Apollo chief Marc Rowan consulted Epstein on firm's tax affairs." The article reported that "Rowan repeatedly corresponded with Epstein . . . over the value of Apollo's so-called 'tax receivable agreement.'" ECF 1 at ¶40. The article added that Epstein was involved in Apollo's tax "inversion" deal and even hosted a meeting between senior executives of Apollo and Edmond de Rothschild, a Swiss private bank, at his Manhattan townhouse in early 2016. *Id*. at ¶¶41-42. And, as Apollo prepared to take its

4913-3013-4694.v1

life insurance affiliate public in 2015, Epstein proposed a plan that "he claimed could save Apollo's co-founders up to $300mn in tax, for which he would charge a 25 per cent success fee." *Id*. at ¶42. Epstein was also involved in "discussions at Apollo about an apparent issue with US tax forms relating to foreign partnerships," and called or met Apollo's chief legal officer, John Suydam, "on multiple occasions." *Id*. On this news, the price of Apollo stock fell nearly 6% over two trading days.

Then, on February 17, 2026, *The Financial Times* published an article titled "SEC urged to investigate Apollo over Epstein ties." The article explained that the American Federation of Teachers and the American Association of University Professors sent a letter to the SEC's enforcement director, Margaret Ryan, asserting that Apollo's communications to investors "'give an inaccurate and incomplete picture of the firm and its partners' connections to Epstein.'" ECF 1 at ¶44. On this news, the price of Apollo stock fell more than 5% over two trading days.

Finally, on February 21, 2026, CNN published an article titled "How Wall Street's Apollo got tangled up again in the Epstein files." The article detailed Apollo's response to the letter sent by the American Federation of Teachers and the American Association of University Professors. CNN quoted Eleanor Bloxham, founder and CEO of The Value Alliance Company, who stated the unions have a "'strong case'" for pushing for an SEC investigation, characterized Apollo's response as "'very weak,'" and questioned why Rowan's meetings and correspondence with Epstein were not previously disclosed. ECF 1 at ¶46. On this news, the price of Apollo stock fell 5%.

As a result of defendants' alleged wrongful acts and omissions and the decline in the value of Apollo securities, the Institutional Investors and other class members have suffered significant losses and damages.

4913-3013-4694.v1

## III.    ARGUMENT

### A.    The Institutional Investors Should Be Appointed Lead Plaintiff

The PSLRA establishes the procedure for the appointment of a lead plaintiff in "each private action arising under [the Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure."  15 U.S.C. §78u-4(a)(1); *see also* 15 U.S.C. §78u-4(a)(3)(B)(i). First, the pendency of the action must be publicized in a widely circulated national business-oriented publication or wire service not later than 20 days after filing of the first complaint.  *See* 15 U.S.C. §78u-4(a)(3)(A)(i).  Next, the PSLRA provides that the Court shall adopt a presumption that the most adequate plaintiff is the person or group of persons that:

> (aa) has either filed the complaint or made a motion in response to a notice . . .;
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. §78u-4(a)(3)(B)(iii)(I).  The Institutional Investors meet these requirements and should be appointed Lead Plaintiff.

### 1.    The Institutional Investors' Motion Is Timely

The statutory notice was published in this action on March 2, 2026 in *Business Wire* and advised putative class members of the action's pendency, the claims asserted, the proposed Class Period, and the right to move the Court to be appointed as lead plaintiff by May 1, 2026.  *See* Declaration of David A. Rosenfeld in Support of Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel ("Rosenfeld Decl."), Ex. A, filed concurrently herewith.  Because this motion is being filed by the statutory deadline, it is timely, and the Institutional Investors are entitled to be considered for appointment as lead plaintiff.

- 4 -

**2.      The Institutional Investors Have a Substantial Financial Interest in the Relief Sought by the Class**

As evidenced by their Certifications and loss chart, the Institutional Investors suffered approximately $672,913 in losses on their purchases of Apollo securities during the Class Period as a result of defendants' alleged violations of the federal securities laws. *See* Rosenfeld Decl., Exs. B, C. To the best of the Institutional Investors' counsel's knowledge, there are no other plaintiffs with a larger financial interest.

**3.      The Institutional Investors Are Typical and Adequate of the Purported Class**

In addition to possessing a significant financial interest, a lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23." 15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(cc). "'At this stage in the litigation, [a] party moving for lead plaintiff of the consolidated action need only make a preliminary showing that it satisfies the typicality and adequacy requirements of Rule 23.'" *Reimer v. Ambac Fin. Grp., Inc.*, 2008 WL 2073931, at *4 (S.D.N.Y. May 9, 2008) (citation omitted). "'[Typicality] is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Id.* (citation omitted). The adequacy requirement is satisfied where: "(1) there [is] no conflict between the proposed lead plaintiff and the members of the class, (2) the selected counsel [is] qualified, experienced, and able to conduct the litigation, and (3) the lead plaintiff [has] a sufficient interest in the outcome to insure vigorous advocacy." *Xianglin Shi v. Sina Corp.*, 2005 WL 1561438, at *3 (S.D.N.Y. July 1, 2005).

Here, the Institutional Investors' claims are typical of those of the class because – like all class members – they purchased Apollo securities during the Class Period at artificially inflated prices, and suffered losses as a result of defendants' alleged misconduct. Substantially similar – if

4913-3013-4694.v1

not identical – legal arguments and discovery will be required to prove defendants' liability. The Institutional Investors therefore satisfy the typicality requirement of Rule 23.

The Institutional Investors are also adequate because their interests in the action are squarely aligned with the interests of the other members of the class. As evidenced by their sworn Certifications and Joint Declaration, the Institutional Investors are highly incentivized to maximize the recovery for all putative class members harmed by defendants' alleged misrepresentations based on, among other things, the substantial losses the Institutional Investors suffered. *See* Rosenfeld Decl., Exs. B, D. Moreover, as institutional investors, the Institutional Investors are precisely the type of investors whose participation in securities class actions Congress sought to encourage through the enactment of the PSLRA. *See generally In re Cendant Corp. Litig.*, 264 F.3d 201, 273 (3d Cir. 2001) ("Both the Conference Committee Report and the Senate Report state that the purpose of the legislation was to encourage institutional investors to serve as lead plaintiff, predicting that their involvement would significantly benefit absent class members."); *Xianglin Shi*, 2005 WL 1561438, at *5 ("'In enacting the PSLRA, Congress expressed an intention to encourage institutional investors to step forward and assume the role of lead plaintiff in an effort to prevent lawyer-driven litigation.' . . . Because the size and experience of institutional investors can be of significant assistance to the prosecution of the action, a number of courts 'have understood [the PSLRA] to favor large institutional investors' as lead plaintiff.") (citation omitted). Indeed, the Institutional Investors are sophisticated fiduciaries, collectively managing hundreds of millions of dollars on behalf of thousands of fund participants and their beneficiaries. As demonstrated in their Joint Declaration, the Institutional Investors have established their ability and willingness to vigorously prosecute this action together. *See* Rosenfeld Decl., Ex. D. Because the Institutional Investors filed a timely motion, have the largest financial interest in the relief sought by the class, and demonstrated

4913-3013-4694.v1

their typicality and adequacy, the Court should adopt the presumption that the Institutional Investors are the "most adequate plaintiff."

**B.    The Court Should Approve the Institutional Investors' Selection of Counsel**

The PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to this Court's approval. *See* 15 U.S.C. §78u-4(a)(3)(B)(v). The Institutional Investors have selected Robbins Geller to serve as lead counsel in this case.[1]

Robbins Geller, a 200-attorney nationwide law firm with offices in New York, regularly practices complex securities litigation. The Firm's securities department includes numerous trial attorneys and many former federal and state prosecutors, and utilizes an extensive group of in-house experts to aid in the prosecution of complex securities issues. Courts throughout the country have noted Robbins Geller's reputation for excellence, which has resulted in the appointment of Robbins Geller attorneys to lead roles in hundreds of complex class action securities cases. *See, e.g.*, *In re Am. Realty Cap. Props., Inc. Litig.*, No. 1:15-mc-00040-AKH (S.D.N.Y.) (Concerning Robbins Geller's role as sole lead counsel in recovering $1.025 billion for the class in a securities case, stating "the role of lead counsel was fulfilled in an extremely fine fashion by [Robbins Geller]. At every juncture, the representations made to me were reliable, the arguments were cogent, and the representation of their client was zealous."); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 1:08-cv-10783-LAP (S.D.N.Y.) (Concerning Robbins Geller's role as sole lead counsel in recovering $272 million for the class of MBS purchasers, stating: "Counsel, thank you for your papers. They were, by the way, extraordinary papers in support of the settlement," and

---

[1]    For a detailed description of Robbins Geller's track record, resources, and attorneys, please see https://www.rgrdlaw.com. An electronic or paper version of the Firm's resume is available upon the Court's request, if preferred.

4913-3013-4694.v1

acknowledging "plaintiffs' counsel's success in the Second Circuit essentially changing the law. I will also note what counsel have said, and that is that this case illustrates the proper functioning of the statute. . . . Counsel, you can all be proud of what you've done for your clients. You've done an extraordinarily good job.").

Robbins Geller has also obtained the largest securities fraud class action recoveries in the Fifth, Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits, as well as a 2019 PSLRA class action trial victory in *HsingChing Hsu v. Puma Biotechnology, Inc.*, No. 8:15-cv-00865-AG (C.D. Cal.), where the jury returned a verdict for plaintiff, finding that defendants Puma Biotechnology, Inc. and its CEO committed securities fraud.[2]

Based upon Robbins Geller's extensive experience and proven track record as counsel in securities class actions, the Court can be assured that by granting this motion, the class will receive the highest caliber of legal representation. Accordingly, the Institutional Investors' selection of Robbins Geller as lead counsel is reasonable and should be approved.

---

[2]    *See In re Enron Corp. Sec. Litig.*, No. 4:01-cv-03624 (S.D. Tex.) ($7.3 billion recovery is largest securities class action recovery in U.S. history and in the Fifth Circuit); *In re Cardinal Health, Inc. Sec. Litig.*, No. 2:04-cv-00575-ALM (S.D. Ohio) ($600 million recovery is the largest securities class action recovery in the Sixth Circuit); *Lawrence E. Jaffe Pension Plan v. Household Int'l Inc.*, No. 1:02-cv-05893 (N.D. Ill.) ($1.575 billion recovery is the largest securities class action recovery following a trial as well as the largest securities class action recovery in the Seventh Circuit); *In re UnitedHealth Grp. Inc. Sec. Litig.*, No. 0:06-cv-01691-JMR-FLN (D. Minn.) ($925 million recovery is the largest securities class action recovery in the Eighth Circuit); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, No. 1:01-cv-01451-REB-KLM (D. Colo.) ($445 million recovery is the largest securities class action recovery in the Tenth Circuit); *In re HealthSouth Corp. Sec. Litig.*, No. 2:03-cv-01500-KOB-TMP (N.D. Ala.) ($671 million recovery is the largest securities class action recovery in the Eleventh Circuit).

## IV.    CONCLUSION

The Institutional Investors satisfy each of the PSLRA's requirements for appointment as lead plaintiff.  Accordingly, the Institutional Investors respectfully request that the Court appoint them as Lead Plaintiff and approve their selection of Lead Counsel.

DATED:  May 1, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD


*s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIELLE S. MYERS
MICHAEL ALBERT
KENNETH P. DOLITSKY
JEREMY W. DANIELS
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
dmyers@rgrdlaw.com
malbert@rgrdlaw.com
kdolitsky@rgrdlaw.com
jdaniels@rgrdlaw.com

Proposed Lead Counsel for Proposed Lead Plaintiff

- 9 -

4913-3013-4694.v1

O'DONOGHUE & O'DONOGHUE LLP
CHARLES W. GILLIGAN
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
cgilligan@odonoghuelaw.com

Additional Counsel

## CERTIFICATE OF WORD COUNT

I hereby certify that the foregoing memorandum of law complies with the formatting and

word-count limitations pursuant to Rule 7.1(c) of the United States District Court for the Southern

District of New York as it contains 2,505 words.

_s/ David A. Rosenfeld_
DAVID A. ROSENFELD

- 10 -

4913-3013-4694.v1